**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Corey Z. | ) | |
| | ) | |
|     *Plaintiff*, | ) | |
| | ) | Case No. 18 CV 50219 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     *Defendant*. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Corey Z. brings this action under 42 U.S.C. § 405(g). The ALJ issued a partially favorable decision, finding that Plaintiff was disabled from March 15, 2010 to December 31, 2013 but that his disability ended thereafter. R. 28. Plaintiff now seeks disability benefits after December 31, 2013. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision is reversed and remanded for further proceedings consistent with this Memorandum Opinion and Order.

### I. BACKGROUND

**A. Procedural History**

Plaintiff filed an application for disability insurance benefits on May 15, 2013. R. 124. He alleged a disability beginning on March 15, 2010, and his date last insured is December 31, 2015. R. 110. The application was denied initially on December 27, 2013 and upon reconsideration on October 1, 2014. R. 124, 141. Plaintiff filed a written request for a hearing on November 23, 2014. R. 169–70. On April 27, 2017, a hearing was held by Administrative Law Judge (ALJ) Jessica Inouye. Plaintiff and his wife appeared and testified via video

conference. Plaintiff was represented by counsel. An impartial vocational expert also appeared and testified via telephone. On July 10, 2017, the ALJ issued a partially favorable decision, finding that Plaintiff was disabled from March 15, 2010 to December 31, 2013, but that his disability ended thereafter. R. 14–38. Plaintiff appealed the decision to the Appeals Council, and the Appeals Council denied Plaintiff's request for review. R. 1–3. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

**B. Medical background**

Plaintiff's alleged disabilities began when Plaintiff struck his head while operating a bulldozer on March 15, 2010. R. 651. Plaintiff lost consciousness and was sent to the emergency room. R. 640. He complained of forehead pain, which he described as throbbing. *Id.* He was discharged the next day. *Id.* One week later, Plaintiff blacked out while driving his car and drove into a ditch. R. 663, 754–56. He was sent to the emergency room again and upon discharge he was diagnosed with closed heady injury, cognitive deficits, ataxia, mobility dysfunction, and post-concussion syndrome with headaches and cognitive impairment. R. 683. Plaintiff had physical therapy and occupational therapy but still suffered from multiple episodes of falling. R. 787, 791, 796.

In June 2010, Plaintiff was referred to Kyle J. Cushing, Psy. D., for a neuropsychological evaluation. R. 663. Dr. Cushing diagnosed Plaintiff with post-concussion syndrome and major depressive disorder (single episode, moderate). R. 672. Dr. Cushing identified Plaintiff's symptoms to include "[p]oor concentration, memory problems, irritability, headaches, fatigue, depression, anxiety, dizziness, and coordination problems." *Id.* In January 2011, Plaintiff was referred to Bruce P. Hermann, Ph. D., for another neuropsychological assessment. R. 933. Dr.

Hermann stated that Plaintiff had "a variety of neurobehavioral complications (headaches, sleep difficulty, dizziness), and unusual psychiatric symptoms/delusions" that can affect Plaintiff's mental status.  R. 937.  Plaintiff continued to complain of headaches, dizziness, difficulty balancing, and twitching on the left side of his body.  R. 1016.  In November 2013, John L. Peggau, Psy. D., conducted Plaintiff's consultative psychological evaluation.  R. 1078.  Dr. Peggau observed that Plaintiff was "very argumentative, entitled, and uncooperative."  Id.  He opined that Plaintiff was "completely recovered from his reported injuries" and that he was "embellishing his impairment."  R. 1081.  In January 2016, Jason Soriano, Psy. D., conducted a psychological assessment report on Plaintiff.  R. 1191.  Dr. Soriano concluded Plaintiff had "significant cognitive and emotional challenges after his brain injury."  R. 1201.  He opined that Plaintiff's post-concussion syndrome caused cognitive weaknesses that had not improved and were not likely to improve to any significant degree.  R. 1200.  He also found that Plaintiff had marked limitations in his activities of daily living and maintenance of social functioning, concentration, persistence, or pace.  R. 1205.

Since March 15, 2010, Plaintiff reports having daily or constant migraine headaches.  He testified at the hearing that his headaches occur "24/7" and never go away.  R. 75.  Plaintiff has been diagnosed with chronic daily headaches.  R. 1090, 1102, 1108.  He kept a migraine log describing the severity of his headaches every day in January and February 2017.  R. 1304–05.  Plaintiff's headaches sometimes included "nausea, vomiting, sonophobia, photophobia, diplopia, vertigo, dizziness[.]"  R. 1094.  Sometimes the pain was so severe that Plaintiff needed to sit in a dark room without any light or sound and cover his head with a blanket or pillow.  R. 60, 1304–05.  Plaintiff also visited the emergency room due to the severity of his migraine headaches.  R.

1143, 1160. Plaintiff was prescribed several medications and received pain injections. R. 1101, 1102, 1108.

**C. The ALJ's decision**

The ALJ went through a five-step analysis to determine whether Plaintiff was disabled under the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4). At step one of the five-step analysis, the ALJ found that Plaintiff had not been engaging in substantial gainful activity since March 15, 2010, when Plaintiff became disabled. R. 18. At step two, the ALJ found that Plaintiff had the following severe impairments from March 15, 2010 to December 31, 2013: cerebrovascular accident, hypertension, depression, personality disorder and cognitive disorder. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 from March 15, 2010 to December 31, 2013. *Id.* Before step four, the ALJ found that, from March 15, 2010 to December 31, 2013, Plaintiff had a residual functional capacity (RFC) to perform sedentary work with the following exceptions: he could never climb ladders, ropes, or scaffolds, he could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, he had to avoid all hazards of unprotected heights and moving dangerous machinery, he could learn, understand, remember, and carry out simple, routine, and repetitive work tasks and sustain these work tasks in two-hour increments throughout the workday, he could occasionally work with the public and co-workers, and he could be off task more than 15% of the workday. R. 19. At step four, the ALJ found that Plaintiff could not perform any past relevant work from March 15, 2010 to December 31, 2013. R. 26. At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that Plaintiff could have

4

performed. R. 27. Thus, the ALJ found that Plaintiff was disabled from March 15, 2010 through December 31, 2013. R. 28.

After determining that Plaintiff was entitled to disability benefits, the ALJ then went through an eight-step analysis to determine if Plaintiff's disability continued or ended. *See* 20 C.F.R. § 404.1594(f). At step one, the ALJ already determined that Plaintiff was not performing substantial gainful activity. R. 18. At step two, the ALJ found that Plaintiff did not develop any new impairments and that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 since January 1, 2014. R. 28. At step three, the ALJ found that medical improvement occurred as of January 1, 2014. R. 30. At step four, the ALJ determined that the medical improvement was related to the ability to work because there was an increase in Plaintiff's RFC. *Id.* If the ALJ had found that the medical improvement was not related to the ability to work, then the ALJ would have considered if an exception applied. But because the medical improvement was related to the ability to work, the analysis proceeded to step six, where the ALJ found that Plaintiff's current impairments were the same impairments from March 15, 2010 to December 31, 2013 and Plaintiff's impairments were severe. R. 28. At step seven, the ALJ found that Plaintiff's RFC was to perform light work except: he could never climb ladders, ropes, or scaffolds, he could occasionally balance, stoop, kneel, crouch, and crawl, he must avoid all hazards of unprotected heights and moving dangerous machinery, he could learn, understand, remember, and carry out simple, routine, and repetitive work tasks, he could relate to others as customarily expected in simple work activities, he could make basic work decisions and adapt to a simple, routine, and repetitive work environment, and these work activities could be sustained in two-hour increments throughout the workday. R. 30–31. The ALJ also found that Plaintiff

5

was still unable to perform past relevant work. R. 36. Finally, at step eight, the ALJ found that beginning January 1, 2014, considering Plaintiff's age, education, work experience, and RFC, there were jobs in significant numbers in the national economy that Plaintiff could perform. *Id.* Thus, the ALJ found that Plaintiff was not disabled since January 1, 2014. R. 37.

## II. STANDARD OF REVIEW

The reviewing court reviews the ALJ's determination to see if it is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Accordingly, the reviewing court takes a very limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)). An ALJ only needs to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But even when adequate record evidence exists to support the ALJ's decision, the decision will not be affirmed if the ALJ does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at *19–20 (N.D. Ill. Oct. 29, 2014).

### III. DISCUSSION

The ALJ issued a partially favorable decision, finding that Plaintiff was disabled from March 15, 2010 to December 31, 2013. R. 14–38. In his motion for summary judgment, Plaintiff is seeking disability benefits after December 31, 2013. Plaintiff argues that the ALJ: (1) failed to consider listing 11.02B; (2) failed to properly evaluate Plaintiff's symptoms beginning January 1, 2014; and (3) failed to give appropriate weight to Dr. Soriano's opinion.

**A. Listing 11.02B**

Plaintiff first argues that the ALJ erred by failing to address his migraine headaches under listing 11.02 (epilepsy). Courts "routinely apply the epilepsy Listing 11.02 when analyzing a claimant's severe migraines because there is no separate listing for migraines or headaches." *Melissa G. v. Saul*, No. 18 CV 50218, 2019 WL 4392995, at *6 (N.D. Ill. Sept. 13, 2019); *see also Horner v. Berryhill*, No. 17 C 7586, 2018 WL 3920660, at *2 n.1 (N.D. Ill. Aug. 16, 2018); *Cooper v. Berryhill*, 244 F. Supp. 3d 824, 829 (S.D. Ind. 2017) (analyzing under listing 11.03, the predecessor of listing 11.02).[1] Specifically, Plaintiff argues that the ALJ did not consider whether his migraine headaches medically equaled listing 11.02B, which describes "[d]yscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1. Medical equivalence means Plaintiff's impairments are at least equal in severity and duration to the criteria of a listed impairment. 20 C.F.R. § 404.1526(a). Plaintiff has "the burden of showing that his impairments meet a listing, and he must show that his

---

[1] Plaintiff relies on *McCampbell v. Comm'r of Soc. Sec.*, No. 3:16cv330-CWR-MTP, 2017 U.S. Dist. LEXIS 142515 (S.D. Miss. Aug. 7, 2017), which the Commissioner questions because it is an out-of-district case. However, in the Northern District of Illinois, the law—that a plaintiff's migraine headaches could equal the severity of listing 11.02—is the same.

impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

Here, despite Plaintiff's testimony that he suffered daily migraine headaches, coupled with medical record evidence of the same, the ALJ never mentioned listing 11.02 and never analyzed whether Plaintiff's migraine headaches equaled this listing. This is especially troubling given that Plaintiff's counsel explicitly argued that Plaintiff's migraine headaches met or equaled listing 11.02 in his brief to the ALJ. R. 622. The Commissioner argues that because the ALJ considered and found that Plaintiff's impairments did not meet or equal *any* listing, this necessarily includes listing 11.02B. However, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

The Commissioner next argues that the state agency physicians concluded that Plaintiff's impairments did not meet or equal any listing. R. 108, 109. Specifically, the Commissioner argues that the "state-agency physicians completed Disability Determination and Transmittal forms, which by themselves conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.'" Dkt. 15 at 7 (quoting *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)). The Commissioner's argument fails for two reasons. First, the ALJ never relied on or referenced the state agency physicians' opinions or the completed Disability Determination forms in her listings analysis. *See* R. 18–19, 28–30. While the ALJ discussed the state agency physicians' opinions later in the ALJ's RFC analysis, the ALJ never mentioned listings when discussing those opinions. R. 34. Second, even if the ALJ relied

8

on the state agency physicians' opinions, none of those opinions addressed listing 11.02. Rather, according the state agency physicians' reports, listings 11.18, 12.04, and 12.08 were the only listings considered. *See* R. 116, 133. The fact that the state agency physicians' opinions mentioned these listings and not listing 11.02 suggests, by negative implication, that they did not consider listing 11.02. And even if the state agency physicians considered this listing behind the scenes, the physicians provided no explanation or analysis, making it impossible for this Court to follow their reasoning. This Court has rejected similar arguments in the past because they "rest[] on a series of attenuated inferences." *Kristen G. v. Saul*, No. 18 CV 50121, 2019 WL 5208855, at *6 (N.D. Ill. Oct. 16, 2019). Thus, the Court finds that the ALJ's listings analysis regarding listing 11.02, if it occurred at all, was perfunctory.

The Commissioner next argues that any error the ALJ may have committed in failing to analyze listing 11.02 is harmless. The Seventh Circuit has stated that an error is harmless only when a court can "predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The Commissioner argues that Plaintiff cannot establish that he suffered seizures and therefore cannot meet listing 11.02. However, Plaintiff argues that his migraine headaches medically equaled listing 11.02. Thus, Plaintiff must present evidence that his migraine headaches are at least equal in severity and duration to the criteria of listing 11.02. "A claimant may therefore demonstrate equivalence to Listing [11.02] by showing that his migraines cause functional impairments equivalent to those described in the Listing." *Cooper v. Berryhill*, 244 F. Supp. 3d 824, 828–29 (S.D. Ind. 2017). Listing 11.02B can be met where the claimant experiences dyscognitive seizures at least once per week for three consecutive months, despite adherence to prescribed treatment. *See* 20 C.F.R. Part 404, Subpt. P App. 1. Courts analyzing migraine headaches under listing 11.02 have found that equivalence

can be shown where migraines occur at these time intervals despite prescribed treatment. *See Snow v. Berryhill*, No. 3:18-CV-434 JD, 2019 U.S. Dist. LEXIS 71368, at *10-11 (N.D. Ind. Apr. 26, 2019) (reversing and remanding the ALJ's perfunctory listing 11.02 analysis because there was evidence that the plaintiff experienced migraine headaches fifteen days of every month, her medications generally did not help, her migraines were exacerbated by noise, she could only obtain relief by trying to sleep, and she received injections and nerve blocks for her headaches); *Kaiser v. Colvin*, No. 1:14-cv-01480-SEB-MJD, 2015 U.S. Dist. LEXIS 89115, at *16-17 (S.D. Ind. June 18, 2015) (reversing and remanding for similar reasons, finding that Plaintiff experienced chronic migraine headaches once or twice a week lasting up to three days, she tried a wide array of prescription medications to resolve her headaches, her migraines were accompanied by pounding, photophobia, and phonobia, and she explained that she goes into a room to lie down until the pain passed).

Here, record evidence supports that Plaintiff's migraine headaches could equal listing 11.02. Plaintiff testified at the hearing that his headaches occur every day or "24/7" and that they never go away. R. 75. The medical record supports Plaintiff's testimony that his headaches were daily or constant since his 2010 bulldozer accident. *See, e.g.*, R. 748 (a June 29, 2010 progress note where Plaintiff described his headaches as "constant 6/10 pain ever since the accident"); R. 929 (on December 21, 2010, Plaintiff reported near-daily, chronic headaches since his injury); R. 997 (on May 17, 2011, Plaintiff stated that his headaches were daily and sometimes they are so bad that he could not open his eyes); R. 1072 (on November 19, 2013, Plaintiff stated that his headaches were daily and 24/7); R. 1090 (diagnosed with chronic daily headache on February 4, 2014); R. 1102 (a March 3, 2014 progress note indicating Plaintiff had a history of chronic daily headaches); R. 1108 (an April 3, 2014 progress note with a heading

labeled "Post concussive syndrome/Chronic daily headaches"); R. 1112 (Plaintiff complaining that his headaches were still "occurring daily" on May 5, 2014). Plaintiff's migraine log also shows daily headaches with varying severity in January and February 2017. R. 1304–05. Daily is greater than the frequency required under listing 11.02B, which requires at least one a week for at least three consecutive months. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The record also contains evidence that Plaintiff's headaches were severe. R. 1304–05 (Plaintiff described several days with 10/10 pain). Plaintiff's symptoms included "nausea, vomiting, sonophobia, photophobia, diplopia, vertigo, dizziness[.]" R. 1094. Plaintiff complained of light and sound sensitivity and blurred vision. R. 1102. Sometimes the pain was so severe that Plaintiff needed to sit in a dark room without any light or sound and cover his head with a blanket or pillow. R. 60, 1304–05. Plaintiff also had to go to the emergency room due to the severity of his migraine headaches. R. 1143 (ER visit on August 4, 2014); R. 1160 (ER visit on September 10, 2014). Finally, Plaintiff was prescribed a wide array of pain medications and received pain injections. R. 1101, 1102, 1108.

Given Plaintiff's testimony and the medical evidence, the Court cannot find the ALJ's perfunctory listing 11.02B analysis as harmless because the Court cannot "predict with great confidence that the result on remand would be the same." *Schomas*, 732 F.3d at 707. The Court is not opining that the record evidence shows that Plaintiff's migraine headaches definitively equal listing 11.02B—only that Plaintiff's migraine headaches *could* equal listing 11.02B. On remand, the ALJ should consult a medical expert to opine on whether Plaintiff's migraine headaches medically equaled listing 11.02B. *See Minnick*, 775 F.3d at 935 ("A finding of medical equivalence requires an expert's opinion on the issue.").

**B. Symptoms evaluation**

The Court also finds that the ALJ erred in her symptoms evaluation. Because the symptoms evaluation impacts the listings analysis and the RFC analysis, a remand is also required for the ALJ to reevaluate Plaintiff's symptoms. *See* 20 C.F.R. § 404.1529(d). Plaintiff argues that the ALJ impermissibly cherry picked when discounting Plaintiff's symptoms related to his migraine headaches beginning January 1, 2014. The regulations describe a two-step process for evaluating Plaintiff's symptoms. First, the ALJ determines if there is an underlying medically determinable physical or mental impairment—shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms. SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's ability to do basic work activities. *Id.*

When evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ must consider the following factors:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016). A reviewing court will reverse the ALJ's credibility determination only if Plaintiff can show that it

was "patently wrong," meaning the ALJ's decision "lacks any explanation or support[.]" *Elder*, 529 F.3d at 413–14 (internal citations and quotations omitted). Still, the ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ does not have to mention every piece of evidence so long as a logical bridge is built from the evidence to the conclusion. *Id.*

Here, the ALJ found that Plaintiff's "statements [beginning January 1, 2014] concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 31. Plaintiff argues that the ALJ failed to consider other substantial evidence when evaluating Plaintiff's symptoms. The Court agrees with Plaintiff and finds that the ALJ's symptoms evaluation is patently wrong for three reasons.

First, the ALJ erred by cherry picking and only focusing on the evidence that supported her conclusion. The ALJ asserted that beginning January 1, 2014, Plaintiff frequently denied having nausea, vomiting, photophobia, blurry vision, or associated auras despite Plaintiff's statements that he has debilitating headaches. However, the record reveals several instances where Plaintiff did have those symptoms, but the ALJ never addressed them. On February 4, 2014, Dr. Rachel Myers wrote that Plaintiff's symptoms included "nausea, vomiting, sonophobia, photophobia, diplopia, vertigo, dizziness[.]" R. 1094. The ALJ incorrectly cited this exact page for the proposition that Plaintiff denied having these symptoms. R. 31 (citing Exhibit 25F/5). In fact, that evidence is consistent with Plaintiff's subjective allegations. On March 3, 2014, Plaintiff complained of light and sound sensitivity and blurred vision. R. 1102. On September 10, 2014, Dr. Jermaine Bridges' review of systems revealed that Plaintiff was

13

positive for photophobia. R. 1163. While the ALJ correctly noted and considered instances beginning January 1, 2014 when Plaintiff reported no nausea, vomiting, photophobia, blurry vision or associated auras, these instances may reflect Plaintiff's symptoms *that day* and do not necessarily reflect the frequency or severity of his debilitating headaches. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) ("The fact Moon did not have a headache at the time of that visit is no reason to conclude anything about the frequency or severity of her migraines."). The ALJ cherry picked and ignored evidence that contradicted her conclusion, which she cannot do.

The ALJ similarly discounted Plaintiff's assertion that his headaches were daily or constant. The ALJ relied on one note from September 10, 2014 that indicated that Plaintiff's headaches were "on and off" for about four years. The ALJ does not explain how "on and off" for about four years necessarily contradicts Plaintiff's assertion that his headaches were daily. Plaintiff's headaches could have been "on and off" within a given day. However, even if the one note contradicted Plaintiff's allegations, the record is replete with evidence that supports Plaintiff's allegations that his headaches were daily or constant beginning January 1, 2014. *See, e.g.*, R. 1090 (diagnosed with chronic daily headache on February 4, 2014); R. 1102 (a March 3, 2014 progress note indicating Plaintiff had a history of chronic daily headaches); R. 1108 (an April 3, 2014 progress note with a heading labeled "Post concussive syndrome/Chronic daily headaches"); R. 1112 (on May 5, 2014, Plaintiff complaining that his headaches were still "occurring daily").

The ALJ also mischaracterized the record when she stated that claimant reported having "normal," "good," "decent," or "better" days 50% of the time in January and February 2017. R. 1304–05. The ALJ cherry picked these words from Plaintiff's January through February 2017 migraine log to support her conclusion that Plaintiff's physical impairments were not unremitting

and have improved. R. 31. However, Plaintiff's migraine log reveals that when Plaintiff characterized his headaches as "better" and "good" on January 26 and 27, 2017, he still rated his pain as 4/10 and only described his headaches as "better" and "good" compared to the previous days when Plaintiff rated his headaches at a maximum severity of "10/10." R. 1304. The ALJ also did not consider that Plaintiff's headache severity reached back up to "10/10" and "8/10" at the end of his migraine log. R. 1305. When these statements are placed in context, they reveal that Plaintiff's headaches occurred daily, fluctuated in intensity but were still occurring at a pain level of 8 to 10 out of 10 by the end of February 2017. "An ALJ has the obligation to consider *all* relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton*, 596 F.3d at 425 (emphasis added). The ALJ impermissibly cherry picked and ignored substantial evidence that supported Plaintiff's allegations of daily headaches.

Second, the ALJ erred by not considering other possible reasons that could explain Plaintiff's lack of treatment. The ALJ stated that Plaintiff was not taking medications for at least a year, did not see his neurologist for months, and did not pursue Botox treatment for his headaches. SSR 16-3p requires that the ALJ "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016). "Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). The Seventh Circuit in *Craft v. Astrue* remanded the ALJ's symptoms evaluation (or credibility

15

finding) for not considering possible reasons as to why the plaintiff did not comply with the treatment:

> [A]lthough the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.

*Craft*, 539 F.3d at 679. Here, the ALJ never questioned Plaintiff at the hearing regarding his medicine noncompliance for migraine headaches.[2] Under SSR 16-3p, there is evidence to support several possible reasons as to why Plaintiff was not taking medications for a year. Plaintiff could have stopped taking medications because he could not tolerate the side effects. *See* R. 1118 (no longer taking Imitrex because side effects included low pulse, extreme dizziness, and shortness of breath); R. 1112 (could not tolerate amitriptyline because it made him drowsy during the day); *see also* SSR 16-3p, 2016 WL 1119029, at *9 (Mar. 16, 2016) ("An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms."). Plaintiff could have stopped because he could not afford to buy the medications. *See* R. 997 (stating that Plaintiff had workers' compensation insurance issues and stated that he could not afford the medications at the time); *see also* SSR 16-3p, 2016 WL 1119029, at *9 ("An individual may not be able to afford treatment and may not have access to free or low-cost medical services."). The ALJ should have questioned Plaintiff about his medicine noncompliance for headaches before drawing a negative inference as to Plaintiff's symptoms. *See Craft*, 539 F.3d at 679.

The ALJ also noted that Plaintiff failed to follow up with his neurological providers for months. Just like Plaintiff's medicine noncompliance, the ALJ never questioned Plaintiff at the

---

[2] Plaintiff did testify at the hearing that he was on a "bunch of different medications" regarding his twitching but they did not help. R. 80.

hearing as to why he did not see his neurologist for months. Plaintiff explained before that he wanted to be referred to a neurologist closer to home, which could have been the reason why he had not seen a neurologist. R. 1097. However, the ALJ never questioned Plaintiff and never considered this reason or other possible reasons before drawing a negative inference as to Plaintiff's lack of treatment. *See Craft*, 539 F.3d at 679.

The ALJ finally discounted Plaintiff's subjective allegations because Plaintiff did not pursue Botox injections. Plaintiff testified that the Botox injections were too expensive. R. 1346. SSR 16-3p provides that this specific reason may be a legitimate reason as to why Plaintiff did not obtain Botox injections. SSR 16-3p, 2016 WL 1119029, at *9 (Mar. 16, 2016) ("An individual may not be able to afford treatment and may not have access to free or low-cost medical services."). The ALJ discounted this statement because "there is no record of the claimant seeking and then being denied coverage" for Botox treatment. R. 31. However, the record contains evidence that Plaintiff had problems with his workers compensation insurance and there was no other evidence that he had any other type of insurance that could cover the Botox injections. At the hearing, the ALJ never asked Plaintiff if he was denied insurance coverage for Botox injections nor did she ask for proof of such a denial. These leaps in logic are difficult for the ALJ to justify.[3]

Third, the ALJ erred by making medical findings to discount Plaintiff's symptoms. The ALJ discounted Plaintiff's symptoms after January 1, 2014 because Plaintiff engaged in "only conservative treatment[.]" R. 31. Evidence of "conservative treatment" may be a reason to discount Plaintiff's subjective allegations. *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)

---

[3] The Commissioner cites *Mitze v. Colvin*, 782 F.3d 879 (7th Cir. 2015) for the proposition that the ALJ reasonably considered the fact that Plaintiff turned down Botox injections as a treatment option. However, *Mitze* is distinguishable because it did not involve a plaintiff who said that the treatment option was too expensive. *Mitze* has no application here.

17

(finding that over-the-counter pain medications to be conservative treatment). However, the ALJ provides no basis in determining that pain injections, nonsteroidal anti-inflammatory drugs, and pain, hypertensive, and anti-epileptic/anti-depressant medications constitute "only conservative treatment[.]" R. 31. The ALJ does not rely on any medical opinion in determining what is "only conservative treatment" to treat migraine headaches. ALJs are "required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon*, 763 F.3d at 722; *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Because the ALJ's "only conservative treatment" reasoning lacks any explanation or support, the ALJ's symptoms evaluation is patently wrong.

In his response brief, the Commissioner generally argues that the ALJ's symptoms evaluation is reasonable because it is largely consistent with Dr. Peggau's consultative psychological evaluation. The Commissioner's argument, however, overlooks the fact that Plaintiff's symptoms argument is limited to Plaintiff's migraine headaches. While Dr. Peggau opined that Plaintiff has "completely recovered from his reported injuries[,]" the ALJ did not recognize that Dr. Peggau made no evaluation, or even mention, of Plaintiff's migraine headaches. R. 1081. Also Dr. Peggau is a psychologist without the qualifications to render a medical opinion as to Plaintiff's migraine headaches. *See Longerman v. Astrue*, No. 11 CV 383, 2011 WL 5190319, at *10 (N.D. Ill. Oct. 28, 2011) (finding that the ALJ improperly relied on a psychologist's opinion because the psychologist never evaluated the plaintiff's migraine headaches and the psychologist was not qualified to render a medical opinion as to the plaintiff's migraine headaches).

On remand, the ALJ should reevaluate Plaintiff's symptoms consistent with this Memorandum Opinion and Order. The symptoms evaluation impacts both the listings analysis and the RFC analysis. *See* 20 C.F.R. § 404.1529(d).

## C. Dr. Soriano's opinion

Plaintiff's final argument is that the ALJ failed to build a logical bridge when she assigned little weight to Dr. Jason Soriano's opinion. In his response brief, the Commissioner argues that the ALJ reasonably discounted Dr. Soriano's opinion because Dr. Soriano was overly credulous of Plaintiff's subjective complaints. Dkt. 15 at 12–13. Plaintiff ignores this argument in his reply brief. Dkt. 16. A failure to respond to an argument raised by the opposing party on appeal results in waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *see also Roxanne R. v. Berryhill*, No. 18 C 5484, 2019 WL 2502033, at *6 n.6 (N.D. Ill. June 17, 2019) ("Notably, Defendant does not respond to this argument, thus, waiving any response."). The Court finds that Plaintiff has waived his argument relating to Dr. Soriano's opinion.

## IV. CONCLUSION

For the reasons listed in this opinion, Plaintiff's motion for summary judgment [11] is granted, the Commissioner's motion [15] is denied. The decision of the Commissioner is reversed, and the case is remanded for the ALJ to analyze listing 11.02B and to reevaluate Plaintiff's symptoms beginning on January 1, 2014 consistent with this Memorandum Opinion and Order.

Date: November 26, 2019          By: *Lisa A. [signature]*
                                      Lisa A. Jensen
                                      United States Magistrate Judge